THE COURT:  Do you swear to tell the truth, the whole truth, and nothing but the truth so help you God?

                    THE WITNESS:  I do.

                    THE COURT:  Be seated.  Speak up.

                    THE WITNESS:  State and spell your name for the record.

                    THE COURT OFFICER:  Alison Smith, A-l-i-s-o-n, S-m-i-t-h.

**A L I S O N   S M I T H**, having been first duly sworn by the Court, testified as follows:

DIRECT EXAMINATION

BY MR. MOTTA:

    Q    Ms. Smith, are you affiliated in any way with BMI?

    A    Yes, I work for BMI.

    Q    In what position?

    A    I'm senior vice-president of distribution and administration services.

    Q    And how long have you been in that position?

    A    I've been in that position for about six months, it was a name change.  Prior to that I was senior vice-president of performing rights.

                    THE COURT:  Senior vice-president for performing...

                    THE WITNESS:  Performing rights.

    Q    And when did you first start working at BMI?

    A    1985.

```
1    A    Correct.
2    Q    And that's the same for the Transformers Energon Theme,
3    the Transformers Cybertron Theme and the Transformers Animated
4    Main Title, correct?
5    A    That's correct.
6    Q    Now we're really done with that exhibit.
7    A    I'm sorry?
8    Q    We're now really done with this exhibit.
9    A    Okay.
10   Q    Just a few more questions.
11        Now, have you ever learned of instances where BMI
12   discovered that compositions Ms. Bryant wrote for Sunbow were
13   registered both at BMI and at ASCAP?
14   A    Yes.
15   Q    Could you describe what that -- what that means, what
16   the input of having the registrations both at BMI and ASCAP
17   means?
18   A    If there's a registration that comes in and the work is
19   fully BMI, i.e., there is a BMI writer and a BMI publisher that
20   goes into the BMI system, if ASCAP receives a registration of
21   the same title with a different writer, they would put that in
22   their system potentially unbeknownst to BMI.
23   Q    So would that mean that writers could collect double
24   royalties?
25   A    That's what that could mean, yes.
```

1  Q    Is that what that meant in this situation?
2  A    In an initial situation in the eighties, yes.
3  Q    Was that corrected?
4  A    Not to my knowledge. We didn't find out about it until
5  much later.
6  Q    Could you describe how you found out about that
7  situation?
8  A    After research into Ms. Bryant's catalog and
9  Mr. Kinder's catalog with respect to some work they were doing
10 with William Dobishinski in the eighties.
11 Q    And what was the result then, what did BMI do?
12 A    Well, it was too late to do anything really at that
13 point. Those were commercial jingles for all of these old
14 titles and by the time it was discovered it was too late really
15 to do anything so we endeavored to make sure that all
16 registrations going forward were -- were correct. And
17 Mr. Kinder subsequently actually joined BMI from ASCAP so that
18 situation wouldn't or didn't occur again.
19 Q    Okay. By "too late to do anything," do you mean that
20 money had already been paid?
21 A    Yes.
22 Q    Was that money paid back?
23 A    No.
24        MR. STRONG: No further questions.
25        MR. MOTTA: Your Honor, I'm just going to limit my

1      questioning to Mr. Strong's questioning as a cross.
2              THE COURT: Yes.
3  CROSS-EXAMINATION
4  BY MR. MOTTA:
5      Q    Ms. Smith, you mentioned this double registration, do
6  you know for a fact that Ms. Bryant double registered?
7      A    No, I do not.
8      Q    And hasn't she denied that the ASCAP Carol Anne Bryant
9  is --
10             THE COURT: Excuse me?
11     Q    Hasn't she denied that the ASCAP Carol Anne Bryant is
12 not her?
13     A    I don't know who Carol Anne Bryant is.
14     Q    The Anne Bryant that was at ASCAP, hasn't she denied
15 that that was not her?
16     A    I don't recall this having anything to do with another
17 Anne Bryant.
18     Q    Do you have any knowledge of Ms. Bryant actually
19 receiving royalties from ASCAP?
20     A    Ms. Bryant received royalties from BMI.
21     Q    I understand that.  But if there was an Anne Bryant at
22 ASCAP, it would be sent to a given address I take it?
23     A    If there was a mixup just like I indicated earlier that
24 could happen with similar names, yes, that's possible.
25     Q    And couldn't it be ascertained whether the Anne Bryant

1  at ASCAP was the same Anne Bryant at BMI?
2      A    There are ways we have of speaking with ASCAP, checking
3  social security numbers, things of that nature, of course.
4      Q    Did you do that in this case?
5      A    It had nothing to do with another Anne Bryant.
6      Q    Yes or no?
7      A    No.
8      Q    Now, you mentioned the registrations of Armada,
9  Energon, Animated, Cybertron, those are audiovisual works?
10     A    I'm going to look at them again.
11     Q    I'm sorry?
12     A    I'm going to look at them again.
13     Q    Absolutely.
14     A    Down in the bottom left --
15          THE COURT:  What is it that you're looking at?
16          THE WITNESS:  Exhibit 91, BMI 109.
17          THE COURT:  Okay.
18     A    This one is Transformers Animated Main Title,
19 Transformers Cybertron Theme, they all have an intended purpose
20 of television that would have been selected by the submitter.
21     Q    Assuming they were for television, wouldn't it be the
22 responsibility of the production company or the television
23 network to file a cue sheet on these programs?
24     A    If the show is actually aired, yes.
25     Q    And would it be the responsibility to accurately set

1  repertoire, if that's what you're referring to, you would get a
2  listing under the writer name of song titles, then you would
3  have to go to that song title in order to ascertain the writer
4  information and the publisher information.
5      Q    Okay.  And if there is a false writer, for want of a
6  better word, a registration in a writer's name that shouldn't
7  have happened for whatever reason, and there is a publisher
8  associated with that writer, wouldn't the publisher benefit?
9      A    I'm not sure I understand the question, I'm sorry,
10 Mr. Motta.
11     Q    You said there was a registration at ASCAP for Anne
12 Bryant?
13     A    No, I didn't say that.
14     Q    What is it that you said?
15     A    I said that in the eighties there were registrations of
16 certain jingles that happened at both ASCAP and BMI which we
17 later came to find out were the same works registered at both
18 societies under different names.
19     Q    Okay.  But you never determined that the ASCAP Anne
20 Bryant was the BMI Anne Bryant?
21     A    I don't know anything about an ASCAP Anne Bryant, I'm
22 sorry.
23     Q    You're talking about a double registration, what do you
24 mean by a double registration?
25     A    I'm talking about the same work being registered at

both societies.

Q   I'm sorry, now I'm really confused.

Isn't it a writer registration that -- that determines royalties and not a work registration?

A   A work registration carries with it payment information as to the writer's share and the publisher's share.  In this particular instance in the eighties there were a series of jingles that related to these works that we're talking about now, Truly Outrageous, Robots in Disguise, et cetera, et cetera, and we came to find out that they were registered at BMI with Ms. Bryant as a hundred percent composer or songwriter, but a hundred percent writer's share and at ASCAP in someone else's name with a hundred percent credit.

Q   Do you know what that name was?

A   Ford Kinder.

Q   But wasn't Ford Kinder an ASCAP writer?

A   Yes, that's why he could then register with ASCAP and we didn't know about it.

Q   Let's take a look at Exhibit ZZ.

THE COURT:  What is "ZZ," remind me?

MR. MOTTA:  It's the BMI royalty statement.

THE COURT:  Okay.

THE WITNESS:  I don't see it.  Oh, here it is.

Q   Okay.  Why don't we look at page 14 of 20.

A   I'm sorry, that's the cover page marked down here



*Writer CoA*
*Anne Bryant - DS2OA*

## LIMITED POWER OF ATTORNEY AND AUTHORIZATION

| ENTERED ON DATA BASE |
|---|
| BY |
| VERIFIED |

To whom it may concern:

The undersigned appoint William N. Dobishinski to act on their behalf in regard to any matters whatsoever in connection with the performing rights societies (including, without limitation, ASCAP and BMI) and to receive all payments (in the name of Artist) and information in connection therewith at 6430 Sunset Blvd., Suite 1500, Hollywood, California 90028. This document may only be cancelled by William N. Dobishinski executing the cancellation provision below.

Writers: ANNE BRYANT     FORD KINDER   *see sheet*

Publishers: *Mutiny Music/BMI*    FORD KINDER

By: ANNE BRYANT     FORD KINDER

Other Entities: KINDER BRYANT

By: _____     FORD KINDER

All of the above "Writers", "Publishers" and "Other Entities" are signing, individually and collectively, on behalf of themselves and any of their related persons or entities.

(Please sign and print names above)

ENTERED ON DATA BASE
6M 1-26-8?
CP 1/27/8?

- ✱ - 3

PUBLISHING ADMINISTRATION AGREEMENT

This AGREEMENT effective as of November 12, 1987, by and between HASBRO, INC., a Rhode Island corporation ("HASBRO"), MILTON BRADLEY INTERNATIONAL, INC., a Massachusetts corporation ("MBI"), whose joint address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862 U.S.A. (hereinafter collectively called "PUBLISHER"), and the LAW OFFICES OF WILLIAM M. DOBISHINSKI, a sole proprietorship whose address is 6430 Sunset Boulevard, Suite 1521, Hollywood, California 90028 U.S.A. (hereinafter called "ADMINISTRATOR").

W I T N E S S E T H :

WHEREAS, HASBRO owns and/or controls certain music publishing copyrights in those compositions set forth on Schedule I attached hereto, and in other musical compositions in the United States of America, including its territories and possessions, and will own and/or control additional new music publishing copyrights in the United States in the future; and

WHEREAS, MBI owns and/or controls certain music publishing copyrights in those compositions set forth on Schedule I attached hereto, and in other musical compositions throughout the Universe outside of the United States of America, and will own and/or control additional new music publishing copyrights throughout the Universe outside of the United States in the future (said music publishing copyrights of both HASBRO and MBI hereinafter referred to as "Compositions"); and

WHEREAS, ADMINISTRATOR has previously assisted in collecting music publishing royalties for PUBLISHER'S music copyrights pursuant to Agreements with Starwild Music, Inc. and Wildstar Music, Inc., (1) dated as of October 1, 1986, regarding advertising music ("Commercial Jingles") and (2) dated as of November 20, 1986, regarding non-advertising music ("Program Music"), both attached hereto as Exhibits A and B, respectively (hereinafter called "FORMER AGREEMENTS"); and

SUN 0712

WHEREAS, ADMINISTRATOR desires to perform services in collecting music performance and mechanical royalties and other monies with respect to PUBLISHER'S music copyrights, including those music copyrights previously a subject of the FORMER AGREEMENTS and also including other music copyrights owned and/or controlled by PUBLISHER, in the manner hereinafter described; and

WHEREAS, PUBLISHER desires to have ADMINISTRATOR perform such services upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, it is hereby agreed:

1. APPOINTMENT

Upon the terms and conditions hereinafter set forth, PUBLISHER grants ADMINISTRATOR, and ADMINISTRATOR accepts, the sole and exclusive universal right and obligation to submit, or supervise the submission by Subpublishers of all materials to Music Publishing Societies in order to obtain the maximum amount of MONIES (as hereinafter defined). Such materials will include, without limitation, Music Publishing Society membership forms, composition registration forms and cue sheets.

For purposes of this Agreement, "Subpublisher" will mean any person or entity, unaffiliated with ADMINISTRATOR, to whom any or all music publishing rights in or to the Compositions is transferred, with PUBLISHER'S prior written consent. "Music Publishing Societies" is to be construed in accordance with its customary meaning in the industry, including, without limitation, so-called "Performing Rights Societies" such as ASCAP and BMI, as well as so-called "Mechanical Societies," such as SDRM in France.

2. TERM

The rights granted to ADMINISTRATOR pursuant to this Agreement will apply to the use, publication, and/or performance (hereinafter "use") of all Compositions throughout the Universe prior to January 1, 1993, regardless of when any MONIES due from such USES are paid (hereinafter "Term").

-2-

3. ADMINISTRATOR'S COMPENSATION

In consideration of the services to be rendered by ADMINISTRATOR hereunder, ADMINISTRATOR will be entitled to the following percentages of all MONIES. For purposes of this Agreement, the term "MONIES" will mean the gross amount of all music performance royalties, mechanical royalties, advances, or other payments by any Music Publishing Society and/or Subpublisher in connection with the use, publication, and/or performance of the Compositions during the Term, throughout the Universe, without deduction for ADMINISTRATOR'S compensation, any Subpublisher's fees or co-publisher's participations.

A. Program Music

(i) For uses of the Compositions, expressly excluding uses as Commercial Jingles, occurring throughout the Universe prior to January 1, 1987, ADMINISTRATOR will receive Twenty Percent (20%), in accordance with the FORMER AGREEMENT dated as of November 20, 1986, attached hereto as Exhibit B.

(ii) For such uses occurring in the United States after December 31, 1986, ADMINISTRATOR will receive Twelve and One-Half Percent (12.5%).

(iii) For such uses of the Compositions throughout the Universe, excluding the United States, occurring prior to January 1, 1989, ADMINISTRATOR will receive Twenty Percent (20%).

(iv) For such uses of the Compositions throughout the Universe, excluding the United States, occurring after December 31, 1988, ADMINISTRATOR will receive Fifteen Percent (15%).

(v) For such uses of any Compositions, which are composed for background use by composers provided by ADMINISTRATOR without cost to PUBLISHER, ADMINISTRATOR will receive:

-3-

SUN 0714

[a] Ten Percent (10%) for uses occurring in the United States;

[b] Fifteen Percent (15%) for uses occurring throughout the Universe excluding the United States.

(vi) In the event that ADMINISTRATOR, with the prior written consent of PUBLISHER, enters into an agreement with any Subpublisher in order to assist the collection of MONIES outside the United States, each such Subpublisher will be entitled to compensation, exclusive of ADMINISTRATOR'S compensation hereunder, of no more than Ten Percent (10%) of any MONIES collected by such Subpublisher, provided that such Subpublisher may also be entited to receive no more than Fifty Percent (50%) of MONIES arising only from any local "cover recording" obtained by such Subpublisher for use in its territory only. As used herein, "cover recording" means any audio record, cassette, or disc to which any Composition is fixed subsequent to the initial use of such Composition in the United States.

B. Commercial Jingles

(i) For uses of the Compositions as Commercial Jingles occurring before July 1, 1987, ADMINISTRATOR will receive Twenty-Five Percent (25%), in accordance with the FORMER AGREEMENT dated as of October 1, 1986, attached hereto as Exhibit A.

(ii) For uses of the Compositions as Commercial Jingles after June 30, 1987, ADMINISTRATOR will receive Fifteen Percent (15%).

(iii) Notwithstanding Subparagraph 3.B.(ii), for uses of the Compositions as Commercial Jingles not involving the services of Griffin Bacal, Inc., 130 Fifth Avenue, New York, New York, 10011, ADMINISTRATOR will receive Twenty Percent (20%) for such uses occurring during the first full annual period, from July 1

-4-

SUN 0715

through June 30, regarding which ADMINISTRATOR renders services in connection with a different advertising agency for the first time. It is specifically contemplated under this Subparagraph that ADMINISTRATOR may perform services with regard to those Commercial Jingles produced for PUBLISHER as work for hire by the advertising agency Needham Harper & Spears; and for those Needham Harper Commercial Jingles used during the period from July 1, 1987 through June 30, 1988, ADMINISTRATOR will receive Twenty Percent (20%).

4. EXPENSES

Except as provided in Paragraphs 3 and 8, all expenses incurred by ADMINISTRATOR in any way carrying out the terms of this Agreement, including, but not limited to, travel expenses, telegram, telephone, and other communication expenses, expenses of filing materials, and expenses involved in the collection of MONIES, will be borne by ADMINISTRATOR, and ADMINISTRATOR will not be entitled to be reimbursed for any such expenses incurred, and PUBLISHER will not be held responsible for any costs incurred by ADMINISTRATOR in connection with this Agreement.

5. STATEMENTS

Any MONIES in which ADMINISTRATOR is entitled to share pursuant to this Agreement will be sent by the relevant Music Publishing Society to whatever person, corporation, or other entity as may be designated by PUBLISHER for such purpose. Any such designee will send all MONIES received on behalf of PUBLISHER to PUBLISHER at the address set forth above no later than within twenty-five (25) days after the end of each calendar quarter during which any such MONIES have been received by such designee. Within thirty (30) days of its receipt of any such MONIES, PUBLISHER will remit all payments due ADMINISTRATOR pursuant to the terms of this Agreement.

SUN 0716

Notwithstanding the foregoing, in regard to all MONIES received by Starwild Music, Inc. and Wildstar Music, Inc. on behalf of PUBLISHER, said companies will remit ADMINISTRATOR'S compensation, as defined herein, directly to ADMINISTRATOR within fifteen (15) days of their receipt of such MONIES, in accordance with Subparagraph 4 of each FORMER AGREEMENT.

In the event that the relevant Music Publishing Society or Subpublisher remits MONIES directly to ADMINISTRATOR, or other entity designated by ADMINISTRATOR, with the prior consent of PUBLISHER, then ADMINISTRATOR will remit payments to PUBLISHER within fifteen (15) days after ADMINISTRATOR'S receipt of any such MONIES.

Any payments by one party to the other will be accompanied by a copy of the original Music Publishing Society statement, as well as a statement including the following information regarding the MONIES received:

    (i) PUBLISHER'S gross MONIES; and
    (ii) ADMINISTRATOR'S compensation; and
    (iii) Any Subpublisher's compensation; and
    (iv) PUBLISHER'S net MONIES.

6. RECORDS

PUBLISHER and ADMINISTRATOR agree to keep accurate books of account and records concerning all MONIES owed or received pursuant to this Agreement. Both parties and their duly authorized representatives may, upon at least twenty-four (24) hours written notice, examine one another's books of account and records pertaining to all MONIES and will have free and full access thereto during usual business hours for said purpose and for the purpose of making extracts therefrom, no more than once each calendar year. All books of accounting records will be kept available for at least two (2) years after the occurrence of the transactions which they reflect and record.

SUN 0717

7. ADMINISTRATOR'S GENERAL OBLIGATIONS

ADMINISTRATOR hereby undertakes, acknowledges, and agrees:

A. To use his best efforts, consistent with good business practice, to promote actively and advance the interest of PUBLISHER in general and in particular with regard to procuring the maximum MONIES;

B. To consult with PUBLISHER respecting the manner and extent of the collection of MONIES and all other matters arising under the provisions of this Agreement;

C. To furnish reports and supply information regarding the collection of MONIES pursuant to this Agreement as may be reasonably requested by PUBLISHER from time to time.

8. EXCLUDED SERVICES

William M. Dobishinski is an attorney licensed to practice in California, New York and the District of Columbia. Except as required to collect the MONIES referred to in this Agreement, William M. Dobishinski is not required to render any other legal or non-legal services. A mutually approved separate agreement would be required for any additional services at additional fees. Specifically without limitation, litigation services by ADMINISTRATOR or anyone else, including all costs associated therewith, are not included under this Agreement.

9. INDEMNITY

PUBLISHER indemnifies and holds ADMINISTRATOR and its employees harmless against any claim, liability or expense (including attorney's fees and court costs) resulting from the use of Compositions, excluding those resulting from ADMINISTRATOR'S wilful misconduct, negligence or breach of this Agreement.

SUN 0718

ADMINISTRATOR indemnifies and holds PUBLISHER and its employees harmless against any claim, liability or expense (including attorney's fees and court costs) resulting from ADMINISTRATOR'S wilful misconduct, negligence or breach of this Agreement.

10. TERMINATION

In the event that either party breaches any term of this Agreement or fails to fulfill its obligations arising hereunder, the party claiming such breach must notify the breaching party upon written notice sent by certified mail, return receipt requested. The breaching party will have thirty (30) days from receipt of such notice to cure such breach. If after thirty (30) days any material breach has not been cured, or is not in the process of being cured, to the reasonable satisfaction of the party claiming breach, such party may terminate this Agreement without court action or arbitration effective immediately. The Term of this Agreement will be deemed to expire as of the effective date of any such termination.

11. OWNERSHIP

ADMINISTRATOR agrees that it will not during the Term, or at any time thereafter, dispute or contest, directly or indirectly, PUBLISHER'S rights in and to the Compositions.

12. NOTICES

All notices and statements to be given, and all payments to be made hereunder will be given or made at the respective addresses of the parties and of the ADMINISTRATOR as set forth above, unless notification of change of address is given in writing, and the date of mailing shall be deemed the date the notice or statement is given. All notices must be sent by certified mail, return receipt requested.

SUN 0719

13. <u>NO JOINT VENTURE</u>

ADMINISTRATOR will not incur any obligation in PUBLISHER'S name, and nothing contained herein will be construed to constitute the parties joint venturers, nor will any similar relationship be deemed to exist between them. Nothing contained herein will be construed as constituting ADMINISTRATOR as PUBLISHER'S agent or as authorizing ADMINISTRATOR to incur financial or other obligations in PUBLISHER'S name without PUBLISHER'S specific prior written consent; and it is specifically understood and agreed that under no circumstances will any power granted, or which may be deemed to be granted to ADMINISTRATOR, be deemed to be coupled with an interest.

14. <u>NO ASSIGNMENT</u>

Except as otherwise set forth in this Agreement, this Agreement and all duties hereunder are personal to ADMINISTRATOR and will not, without the written consent of PUBLISHER, be assigned, sublicensed or delegated by ADMINISTRATOR or by operation of law. Further, any transfer of the COMPOSITIONS by PUBLISHER will be subject to this Agreement.

It is a basis of this Agreement and the understanding between the parties that William A. Dobishinski will be and will remain the "key person" rendering services on behalf of ADMINISTRATOR for PUBLISHER pursuant to this Agreement. In the event that William M. Dobishinski no longer acts as the "key person" rendering such services (including, without limitation, due to death or disability), then PUBLISHER may terminate this Agreement upon written notice within thirty (30) days after PUBLISHER has knowledge of such event, without prejudice to any other rights and remedies. The Term of this Agreement will be deemed to expire as of the effective date of any such termination (which, in the event of ADMINISTRATOR'S death, will be deemed to be the date of death).

Notwithstanding anything to the contrary herein, ADMINISTRATOR may assign its rights to receive MONIES under this Agreement, except that PUBLISHER will not be obligated to make direct payment to any third party.

SUN 0720