## 15. NO WAIVER

No waiver or modification of any of the terms of this Agreement will be valid unless in writing and signed by the party to be charged. No waiver by either party of a breach hereof or a default hereunder will be deemed a waiver by such party of a subsequent breach or default of like or similar nature. Any approval or consent given by PUBLISHER will not constitute a waiver of any of PUBLISHER'S rights or ADMINISTRATOR'S duties under any provision of this Agreement. The failure of either party to enforce, or the delay by either party in enforcing, any of its rights under this Agreement will not be deemed a continuing waiver or a modification thereof, and either party may, within the time provided by applicable law, commence appropriate legal proceedings to enforce any or all of such rights. No person, firm, group or corporation, other than ADMINISTRATOR and PUBLISHER, will be deemed to have acquired any rights by reason of anything contained in this Agreement, except as otherwise specifically provided herein.

## 16. ENTIRE AGREEMENT

This Agreement contains and embodies the entire agreement and understanding of the parties and supersedes all prior written or oral agreements or understandings between the parties concerning the subject matter hereof, including without limitation the FORMER AGREEMENTS as they relate to the Compositions. Notwithstanding the foregoing, however, the validity of the FORMER AGREEMENTS, but only prior to the effective date of this Agreement and only insofar as said FORMER AGREEMENTS are not inconsistent with the terms and conditions of this Agreement, is confirmed and ratified insofar as said FORMER AGREEMENTS relate to the Compositions. Insofar as PUBLISHER is concerned, the FORMER AGREEMENTS remain unaffected as they relate to any music copyright, other than Compositions, owned or administered by Wildstar Music, Inc., Starwild Music, Inc., Sunbow Productions, Inc. and/or Griffin Bacal, Inc. No warranties, representations, understandings, promises, agreements or conditions, express or implied, not contained herein have been made or will be enforceable by either party concerning the subject matter hereof or any relationship between the parties.

SUN 0721

17. **DISPUTES/GOVERNING LAW**

Any controversy between the parties hereto involving this Agreement will be resolved by arbitration at New York, New York in accordance with the laws of the State of New York (which State will have exclusive jurisdiction of this Agreement), and the procedural rules of the American Arbitration Association. Any determination or finding by the American Arbitration Association, in regard to any dispute submitted hereunder, will be final and binding upon the parties hereto, and may be entered as a final judgment in any state and/or federal court having jurisdiction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly signed and effective as of the date first above written upon execution by PUBLISHER and ADMINISTRATOR.

MILTON BRADLEY INTERNATIONAL, INC.
BY: _[signature]_
ITS: Senior Vice President
DATE: November 25, 1987

LAW OFFICES OF WILLIAM M. DOBISHINSKI
BY: _[signature]_
ITS: Sole Proprietor
DATE: November 17, 1987

HASBRO, INC.
BY: _[signature]_
ITS: Senior Vice President
DATE: November 25, 1987

SUN 0722

SCHEDULE I

All music published by Starwild Music, Inc. and/or Wildstar Music, Inc., in the following television programs, theatrical motion pictures, videocassettes, audio cassettes or records:

BIGFOOT
CHARMKINS
G.I. JOE
G.I. JOE - THE MOVIE
GLOFRIENDS
GLOFRIENDS SAVE CHRISTMAS
INHUMANOIDS
JEM
MOONDREAMERS
MY LITTLE PONY
MY LITTLE PONY & FRIENDS
MY LITTLE PONY - THE MOVIE
POTATO HEAD KIDS
ROBOTIX
SUPER SATURDAY/SUPER SUNDAY
TRANSFORMERS
TRANSFORMERS - THE MOVIE
VISIONARIES

SUN 0723

 

**MILTON BRADLEY INTERNATIONAL, INC.**

1027 NEWPORT AVENUE
PAWTUCKET, RHODE ISLAND 02861 U.S.A.
TELEPHONE (401) 727-5000
TELEX NUMBER: 6817073 HASBINT
FAX NUMBER: 401-727-5544

## LETTER OF REPRESENTATION

As of November 12, 1987

To Whom it May Concern:

The undersigned appoint the law offices of William M. Dobishinski and its designees to represent them at music rights societies throughout the Universe outside of the United States of America in connection with their compositions and to receive all information and checks in connection therewith at 6430 Sunset Boulevard, Suite 1521, Hollywood, California 90028 or as otherwise designated by the Law Offices of William M. Dobishinski.

MILTON BRADLEY INTERNATIONAL, INC.

BY: _[signature]_
ITS: Senior Vice President
DATE: November 25, 1987

SUN 0724



HASBRO, INC.

1027 NEWPORT AVENUE
P.O. BOX 1059
PAWTUCKET, RHODE ISLAND 02862-1059 U.S.A.
TELEPHONE (401) 726-4100
TELEX: (230) 6814168

## LETTER OF REPRESENTATION

As of November 12, 1987

To Whom it May Concern:

The undersigned appoint the law offices of William M. Dobishinski and its designees to represent them at music rights societies throughout the United States of America in connection with their compositions (including, without limitation, ASCAP and BMI) and to receive all information and checks in connection therewith at 6430 Sunset Boulevard, Suite 1521, Hollywood, California 90028 or as otherwise designated by the Law Offices of William M. Dobishinski.

HASBRO, INC.

BY: _____
ITS: Senior Vice President
DATE: November 25, 1987

SUN 0725

DATED AS OF: November 12, 1987

ASSIGNMENT

In consideration of the sum of one dollar ($1.00) and other good and valuable consideration, Television and Advertising Music Administration ("TAMAD", a d/b/a of William M. Dobishinski), as "Assignor" hereby assigns to the Law Offices of William M. Dobishinski (a d/b/a of William M. Dobishinski), as Assignee, all of Assignor's rights and obligations pursuant to the agreements with Starwild Music, Inc., and Wildstar Music, Inc. (together "Client") regarding advertising music, dated as of October 1, 1986, and regarding non-advertising music, dated as of November 20, 1986, both attached hereto as exhibits A and B, respectively. Assignee hereby accepts such assignment and Client hereby consents to such assignment.

Television And Advertising
Music Administration

By: _William M. Dobish_____

Starwild Music, Inc.

By: _[signature]_____

Law Offices of
William M. Dobishinski

By: _William M. Dobish_____

Wildstar Music, Inc.

By: _[signature]_____

SUN 0726

Dated as of: November 12, 1987

TAMAD

d/b/a William M. Dobishinski
6430 Sunset Blvd.
Suite 1521
Hollywood, California 90028

Re: (1) Agreement, dated as of October 1, 1986, between Wildstar Music, Inc./Starwild Music, Inc. and TAMAD and

(2) Agreement, dated as of November 20, 1986, between Wildstar Music, Inc./Starwild Music, Inc., and TAMAD (together the "Former Agreements")

Dear Bill:

This will confirm that you were requested to renegotiate the Former Agreements as they relate to compositions ("Company Compositions") owned and/or controlled by Hasbro, Inc., and/or Milton Bradley International, Inc. (together, "Company"). You were authorized to negotiate and conclude an agreement directly with Company ("Company Agreement"). Such Company Agreement (attached hereto) shall be deemed to supercede the Former Agreements as they relate to the Company Compositions.

The Former Agreements are ratified and confirmed as they relate to compositions not owned and/or controlled by Company.

This letter is without prejudice to the respective rights, if any, of Starwild Music, Inc./Wildstar Music, Inc. in any income from the Company Compositions remaining after deductions set forth in the Company Agreement.

Very Truly Yours

STARWILD MUSIC, INC.

By: _____

WILDSTAR MUSIC, INC.

By: _____

SUN 0727

**BMI**

# BMI FEATURE ROYALTIES STATEMENT

ANNE BRYANT  D8204

C/O WILLIAM DOBISHINSKI
6430 SUNSET BLVD.
SUITE 1504
HOLLYWOOD, CA. 90028

DISTRIBUTION DATE: [illegible]
QUARTER ENDING: [illegible]
COMMERCIAL JINGLES

| TITLE | TOTAL PERFORMANCES | PERFORMANCES CREDITED TO YOU | SOURCE | AMOUNT |
|---|---|---|---|---|
| MY BUDDY | 24,845 | 100% | 24,845 | T.V. LOCAL | 9,316.88 |
| MUSCLE MACHINE | 13,556 | 100% | 13,556 | T.V. LOCAL | 5,083.50 |
| GOOGLIES | 235 | 100% | 235 | T.V. LOCAL | 88.13 |
| GAMES | 235 | 100% | 235 | T.V. LOCAL | 88.13 |
| GAMES | 50,697 | 100% | 50,697 | T.V. NETWORK | 7,050.00 |
| ROBOT, IN DISGUISE | 142,649 | 33-3% | 47,550 | T.V. LOCAL | 19,011.38 |
| REAL AMERICAN HERO | 160,948 | 100% | 160,948 | T.V. LOCAL | 17,831.25 |
| WATCHIMALS | 24,160 | 100% | 24,160 | T.V. LOCAL | 60,355.50 |
| GET IN SHAPE GIRL | 20,114 | 100% | 20,114 | T.V. LOCAL | 9,060.00 |
| WUZZIES | 44,051 | 100% | 44,051 | T.V. LOCAL | 7,542.75 |
| ROBOTIX | 18,292 | 100% | 18,292 | T.V. LOCAL | 16,519.13 |
| TRULY OUTRAGEOUS | 49,221 | 100% | 49,221 | T.V. LOCAL | 6,859.50 |
|  |  |  |  | 18,457.88 |

PAID BY CHECK  $177,175.90

$177,175.90

Handwritten notes:
- JEM
- *ROBOT IN DISGUISE --- IS TRANSFORMERS THEME & MUSIC
- SHOULD BE 50%: WHITING'S SHARE WOULD YIELD @ 50% $26,746.88 - SHIMON (AND PAID) IS 33% = 17,831.25
- ** REAL AMERICAN HERO IS G.I. JOE MUSIC THEME
- *** TRULY OUTRAGEOUS IS JEM THEME MUSIC

**BMI** D82204

# U.S. FEATURE ROYALTIES STATEMENT
## COMMERCIAL JINGLES

ANNE BRYANT
6430 SUNSET BLVD.
SUITE 1521
HOLLYWOOD, CA. 90028

DISTRIBUTION DATE / QUARTER ENDING: ANNE BRYANT

| TITLE | TOTAL PERFORMANCES | YOUR PERFORMANCES CREDITED TO YOU | SOURCE | BONUS LEVELS | AMOUNT |
|---|---|---|---|---|---|
| AIR RAIDERS | 28,565 | 100% | 28,565 | TV LOCAL | | 10,711.88 |
| BATTLE BEASTS | 23,652 | 100% | 23,652 | TV LOCAL | | 8,869.50 |
| BED BUGS | 8,448 | 100% | 8,448 | TV LOCAL | | 3,168.00 |
| BIG BIGGER BIGGEST | 134 | 100% | 134 | TV NETWORK | | 4,020.00 |
| BIG BIGGER BIGGEST | 35,171 | 100% | 35,171 | TV LOCAL | | 13,189.13 |
| BUCKETS OF FUN | 3,254 | 100% | 3,254 | TV LOCAL | | 1,220.25 |
| CONNECT FOUR | 8,066 | 100% | 8,066 | TV LOCAL | | 3,024.75 |
| DUCKETALES | 13 | 100% | 13 | TV NETWORK | | 390.00 |
| DUCKETALES | 1,496 | 100% | 1,496 | TV LOCAL | | 561.00 |
| FLIP OUT | 6,198 | 100% | 6,198 | TV LOCAL | | 2,324.25 |
| I LOVE FAZZ | 17,136 | 100% | 17,136 | TV LOCAL | | 6,426.00 |
| KID SISTER | 7,521 | 100% | 7,521 | TV LOCAL | | 2,820.38 |
| MAGICAL LIGHT | 39,168 | 100% | 39,168 | TV LOCAL | | 14,688.00 |
| MOUSETRAP | 7,084 | 100% | 7,084 | TV LOCAL | | 2,656.50 |
| MY BUDDY | 178 | 100% | 178 | TV NETWORK | | 5,340.00 |
| MY BUDDY | 122 | 100% | 122 | TV LOCAL | | 45.75 |
| MY LITTLE PONY | 26 | 100% | 26 | TV NETWORK | | 780.00 |
| MY LITTLE PONY | 74,139 | 100% | 74,139 | TV LOCAL | | 27,802.13 |
| NOW YOU'RE COOKIN | 1,064 | 100% | 1,064 | TV LOCAL | | 399.00 |
| OPERATION | 6,705 | 100% | 6,705 | TV LOCAL | | 2,514.38 |
| REAL AMERICAN HERO | 101,870 | 33.3% | 33,957 | TV LOCAL | | 12,733.88 |
| REALLY GROWIN | 2,011 | 100% | 2,011 | TV LOCAL | | 754.13 |
| ROBOT IN DISGUISE | 84,253 | 100% | 84,253 | TV LOCAL | | 31,594.88 |
| ROBOTIX | 117 | 100% | 117 | TV NETWORK | | 43.88 |
| SCOOTIN KIDS | 58 | 100% | 58 | TV NETWORK | | 1,740.00 |
| SCOOTIN KIDS | 2,668 | 100% | 2,668 | TV LOCAL | | 1,000.50 |
| SHARE THE FUN | 12 | 100% | 12 | TV NETWORK | | 360.00 |
| SHARE THE FUN | 19,087 | 100% | 19,087 | TV LOCAL | | 7,157.63 |
| START THEIR DAY | 27,371 | 100% | 27,371 | TV LOCAL | | 10,264.13 |
| TRULY OUTRAGEOUS | 21,979 | 100% | 21,979 | TV LOCAL | | 8,242.13 |
| WATCHIMALS | 265 | 100% | 265 | TV LOCAL | | 99.38 |

SOURCE LEGENDS EXPLAINED ON REVERSE SIDE

BMI    320 WE  th STREET    NEW YORK, N.Y.

For the record, Plaintiff provides below the list of Foreign PROs that have (for many years) paid royalties to Plaintiff for background uses ("cues") of her music, without also paying royalties to Plaintiff for her Songs and Themes:

SOCAN, CANADA
SAIE, ITALY
SGAE, SPAIN
TEOSTO, FINLAND
STIM, SWEDEN
ACUM, ISRAEL
SACM, MEXICO
BUMA, NETHERLANDS
SABAN, BELGIUM
UBC, BRAZIL
SAMRO, SOUTH AFRICA
SCD, CHILE
APRA, AUSTRALIA  (APRA pays small number of theme and song plays)
SACEM, FRANCE
JASRAC, JAPAN
SPA, PORTUGAL
LATGA, LITHUANIA
COMPASS, SINGAPORE
IMRO, IRELAND
SADAIC, ARGENTINA
AEPI, GREECE
CASH, HONG KONG  (Hong Kong pays JEM feature songs)
KODA, DENMARK
GEMA, GERMANY
PRS-MPCS, ENGLAND.

S

AGREEMENT made of this 1st day of June, 1986, by and between SUNBOW PRODUCTIONS, INC. ("Company"), whose business address is 380 Lexington Avenue, Suite 1105, New York, New York 10168, and KINDER & BRYANT LTD. ("Contractor") whose business address is 41 West 73rd Street, New York, New York 10023, f/s/o Anne Bryant and Ford Kinder (jointly referred to as "Writer").

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1. Company hereby engages Contractor and Contractor hereby accepts such engagement, to furnish the services of Writer to Company for the purpose of writing, preparing and delivering to Company original musical material (hereinafter referred to as the "Music") for songs to be used in a fully-animated children's television show consisting of either five one-half hours, fifteen segments, or a television motion picture, presently entitled "JEM" (the "Show")(it being understood that the mention of the Show is for purposes of identification only and shall in no way restrict Company's rights in the Music, and the use thereof, as set forth in this Agreement). The number of songs for which music is to be written and delivered by Writer hereunder shall be determined by Company. The Music shall be delivered to Company in accordance with a schedule to be mutually determined by the Company and Contractor.

2. (a) For all rights herein granted to Company in the Music, and for performance by Contractor of all obligations hereunder (including but not limited to composing and arranging the Music, supervision of the orchestra recording of the Music for the Show, and Company's right to use the Music on and in connection with phonorecordings sold or distributed in conjunction with merchandise based on the Show ["Premium Cassettes"]), Company shall pay Contractor a fee of Two Thousand Two Hundred ($2,200) Dollars for each song for which Writer writes and delivers the Music, payable on delivery thereof.

(b) Payment by a parent or affiliate of Company shall be deemed to constitute payment by Company hereunder. Nothing herein contained shall be deemed to impose any obligation on Company to use or authorize the use of the Music, and Company shall have fully discharged its obligations to Contractor hereunder by payment to Contractor of the amount specified in subparagraph (a) of this Paragraph 2.

3. Contractor shall deliver one (1) copy of the Music to Company as Company shall designate.

4. It is understood and agreed that Writer may write the Music at such times and places as Writer may choose, subject only to Contractor's obligation to make timely delivery of the Music in accordance with the terms of this Agreement.


DEFENDANT'S EXHIBIT M

SUN 0870

5. (a) Contractor warrants, acknowledges and agrees that the Music to be written by Writer and delivered by Contractor is to be written by Writer under and pursuant to an employment agreement between Contractor and Writer pursuant to which Contractor is entitled to the exclusive services of Writer, and to all the results of Writer's services; that the Music was specifically ordered and commissioned by Company for use as part of an audiovisual work; and that the Music is a work made for hire within the meaning of Section 101 of the United States Copyright Act. Upon writing of the Music, all right, title and interest therein shall automatically vest in Company and Company shall be the sole and unlimited owner thereof and of all rights therein throughout the world forever, and Company shall be entitled to copyright therein, including statutory copyright and all renewals thereof, as copyright author and proprietor. Company may freely assign and grant rights and licenses with respect to the Music and any copyrigt therein (including any renewals thereof), and in this connection Contractor agrees to execute and deliver and/or cause Writer to execute and deliver to Company any and all instruments required by Company in connection with the use and enjoyment of the Music and of Company's rights therein and thereto. Contractor hereby appoints Company as Contractor's and Writer's attorney-in-fact with the right but not the obligation to execute any such instruments in Contractor's or Writer's name on Company's behalf. On execution hereof, Contractor shall sign and shall cause Writer to sign the Certificate of Authorship attached hereto for the Music.

(b) Without in any way limiting the generality of the foregoing, it is agreed that Company shall have the exclusive right and may license others to use, adapt, arrange, change, add to, or subtract from the Music and to combine the same with other literary material and/or lyrics and to publish, record, produce, reproduce, transmit, perform, broadcast, telecast, and/or otherwise communicate the same or any version or versions thereof by any means (including, but not limited to, in synchronization with motion pictures, television and/or any other form of recordation or reproduction of sight and/or sound), whether now known or hereafter devised, publicly for profit or otherwise, it being understood that Contractor and Writer hereby waive any so-called "moral rights" which may now be or may hereafter be recognized. It is understood and agreed that neither Contractor nor Writer shall have any right, title or interest in any other literary material and/or lyrics which may be combined with the Music.

(c) During any period or periods of time during which Writer is affiliated with any small performing rights society (herein called the "Society"), Company shall and does hereby, under and pursuant to this Paragraph, license back to Writer the so-called "writer's share" (<u>i.e.</u>, fifty (50%) percent) (but, if the Music or any form thereof are the composition of

- 2 -

0040H

Writer and other composers and/or lyricists, then the grant hereunder shall be deemed a grant of the "writer's share" to Writer and all other such lyricists and/or composers jointly except that for instrumental uses, only Writer and any other composer(s) shall share in the "writer's share") in the non-dramatic (i.e., "small") performing rights in the Music so as to enable Writer to license such non-dramatic performing rights to Society, and to collect the "writer's share" of royalties derived therefrom, it being understood, in this connection, that Company (or any assignee or licensee of all or any of Company's rights under this Agreement) shall not exercise such non-dramatic performing rights during such period or periods without obtaining a license therefor from Society, except that Company and/or any such assignee or licensee, may exercise such non-dramatic performing rights in the Music by reason of, under and pursuant to this Agreement,

      (i) during any period or periods during which such non-dramatic performing rights are not controlled by and/or available for license to Company or any such assignee or licensee at standard rates from Society, or in the case of public performances of the Music in geographical areas outside of Society's jurisdiction, from any other organization or society which is affiliated with Society or which has a collection agreement with Society and which controls the non-dramatic performing rights in any geographical area in which the Music is to be performed; and/or

      (ii) in connection with theatrical exhibitions in the United States, its territories and possessions; and/or

      (iii) in connection with any performance of the Music within the United States, its territories and possessions, which is not a public performance;

it being understood that Company (and/or any such assignee or licensee) shall have no obligation to pay any royalties or other sums to Writer, Contractor, Society, or any successor to the rights of any of them with respect to non-dramatic performances of the Music made pursuant to subclauses (i) through (iii) hereof. If Company makes or authorizes any non-dramatic performances of the Music under and pursuant to this Agreement, and if Writer or Contractor shall assert any claim that any such performance violates any rights of Writer or Contractor, then (A) under no circumstances shall Writer or Contractor have the right to take any action or initiate any proceeding with respect to such claim which would have the effect of enjoining and/or preventing and/or otherwise interfering with any said non-dramatic performances, it being agreed that any such action or proceeding shall be limited to an action at law for damages; and (B) if Writer or Contractor

shall assert such a claim pertaining to a non-dramatic performance of the Music made by any assignee or licensee of Company, then any action taken or proceeding brought by Writer or Contractor shall be limited to an action at law for damages against such assigee or licensee exclusively. The foregoing references to Society shall not be construed as giving Society any independent right to take any action or initiate any proceeding against Company or any of its assignees or licensees with respect to any such claim.

(d) Without limiting the generality of any rights granted under this Agreement, and notwithstanding any license hereunder to Writer pursuant to subparagraph (c) above, Writer and Contractor expressly acknowledge that Company, its successors, assigns and/or licensees shall have the right to collect the "publisher's share" of performance royalties becoming due and payable hereunder from any small performing rights society by reason of performances of the Music, it being expressly agreed that Writer and Contractor shall not be entitled to any share of such monies which are distributed to Company, its successors, assigns, and/or licensees by any small performing rights society. Writer shall be entitled to collect the "writer's share" of any such royalties with respect to the Music jointly with any other lyricists and/or composers of such Music. The terms "publisher's share" and "writer's share" as used in this Agreement have the same meaning here as is commonly understood in the music publishing and motion picture and television industries. Company may represent to any domestic or foreign performing rights society or similar organization requiring an acknowledgement of the type made by Writer herein that Contractor and Writer have acknowledged Company's right to collect and retain the publisher's share of royalties; further, if any such society or organization requires written authorization from Writer or Contractor in order to make payments of the publisher's share of royalties to Company, Writer and Contractor shall promptly execute and deliver such authorization. If any such society or organization makes payment to Writer or Contractor of all royalties (i.e., both "writer's" and "publisher's" share) with respect to any performance to Writer, Contractor shall promptly remit one-half (1/2) of such royalty to Company.

6. Further, in the exercise of its rights hereunder and without in any way limiting the generality of the foregoing, Company shall have, as owner and copyright proprietor of the Music, the complete control of the publication of the Music and of all rights incident thereto, including, but not limited to, the right to license the manufacture of phonograph records and other recordings of the Music and the right to license motion picture synchronization rights (all of which rights are herein sometimes collectively called "music publishing rights"). Without limiting the generality of the foregoing, it is agreed that Company may assign or license any or all such music publishing rights and/or any or all other rights granted to Company under this Agreement to

0040H

- 4 -

SUN 0873

any music publishing company or production company which is a parent or subsidiary of Company or otherwise affiliated with Company or to any other third party.

(a) With respect to Company's exercise of music publishing rights in the Music (as defined above)(but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(i) sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

(ii) for regular piano copies, if any, sold and paid for at wholesale in the United States and/or Canada, sums equal to eight cents (.08) per copy for the first one hundred thousand (100,000) copies sold, and ten cents (.10) per copy for copies sold in excess of 100,000;

(iii) sums equal to fifty (50%) percent of net proceeds received by Company from third parties for regular piano copies, if any, sold and paid for at wholesale outside of the United States and/or Canada;

(iv) with respect to orchestrations, including band arrangements, if any, sold and paid for at wholesale anywhere in the world, sums equal to ten (10%) percent of the wholesale price therefor, after trade discounts;

(v) with respect to any songbook, folio or similar publication, if any, sold and paid for at wholesale anywhere in the world, sums equal to the amount resulting from dividing ten (10%) percent of the wholesale price, after trade discounts, therefor by the total number of copyrighted musical compositions contained in such publication;

(vi) with respect to other uses of the Music hereunder, sums equal to the amount resulting from dividing fifty (50%) percent of the net proceeds received by Company from third parties therefor by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

- 5 -

0040H

SUN 0874

No royalties shall be payable hereunder for professional material not sold or resold; further, no royalties shall be payable to Writer with respect to uses of the Music except as hereinabove expressly set forth. The term "theatrical motion picture rights" as used herein refers to synchronization rights granted with respect to motion pictures intended primarily and initially for theatrical release by direct projection before paid-admission audiences; in no event shall such term refer to motion pictures or other methods of recordation, whether now known or hereafter devised, which are produced primarily and initially for television broadcasting by any means whatsoever. The term "net proceeds" as used hereinabove, shall mean all monies (including advances) actually received by Company (or any assignee of Company's rights or licensee hereunder) which are directly attributable to licenses issued authorizing the manufacture of commercial phonograph records and/or licenses relating to theatrical motion picture synchronization rights, and/or for the exercise of publication rights referred to in subclause (iii) above, as the case may be, after the deduction of all costs, expenses, fees and commissions which are directly attributable to the exploitation of the Music and combined music by way of commercial phonograph records or by way of theatrical motion picture synchronization, or by way of publication, as the case may be, computed in accordance with good and standard practices. In the event that Company licenses the Music in a form containing music or other literary materials written or composed by any third party or parties, then Contractor's royalties thereon, shall be reduced proportionately to an amount equal to the royalties payable hereunder divided by the number of composers and lyricists (including Writer) who have furnished materials and services for such use and who are entitled to receive royalties from Company, provided that in no event shall Writer receive less than one-half of the royalty Writer would otherwise be entitled to receive hereunder. Company shall render royalty statements to Contractor, accompanied by any remuneration due Contractor, such statements to be rendered at least twice during each calendar year during which royalties are payable.

(b) If, for any reason, exportation of money to the United States from any foreign country, territory or place should be prohibited, prevented or rendered commercially impracticable, the amount received by Company (if Company's share thereof is actually paid to Company in such foreign country, territory or place) shall not be considered gross receipts hereunder unless and until the same shall have actually been received in the United States in United States currency, less any discounts, losses, costs or expenses suffered by or imposed upon Company with respect to transmittal of such money to the United States and the conversion thereof to United States currency; provided, however, that if Contractor so requests in writing, that portion of such blocked or frozen funds which would represent Contractor's share of net proceeds of such gross receipts, but for being frozen or blocked, shall be deposited in Contractor's name in any bank or

SUN 0875